# FLORIDA EAST COAST RAILWAY COMPANY *v.* UNITED STATES.

### APPEAL FROM THE COMMERCE COURT.

No. 383.   Argued January 15, 16, 1913.—Decided June 8, 1914.

The rule that a finding of fact made by the Interstate Commerce Commission concerning a matter within the scope of the authority delegated to it is binding and may not be reëxamined in the courts, does not apply where the finding was made without any evidence whatever to support it; the consideration of such a question involves not an issue of fact, but one of law which it is the duty of the courts to examine and decide.

The record does not disclose any evidence justifying the order of the Commission directing a reduction of rates which had been held to be reasonable by a prior order of the Commission.

In a proceeding against several railroads, testimony as to the condition of traffic on certain railroads does not tend to establish conditions on another road in regard to which no testimony is given and where the record shows essential differences between it and those roads in regard to which the testimony was given.

200 Fed. Rep. 797, reversed.

THE facts, which involve the validity of an order of the Interstate Commerce Commission establishing rates on citrus fruits and vegetables from points of production in Florida to exterior points of consumption, are stated in the opinion.

*Mr. Frederick C. Bryan* and *Mr. Alex. St. Clair-Abrams* for appellant.

*Mr. Blackburn Esterline*, Special Assistant to the Attorney General, with whom *Mr. Solicitor General Bullitt* was on the brief, for the United States:

The investigations before the Interstate Commerce Commission into the rates on citrus fruits, vegetables, and pineapples from southern Florida to the north engaged the attention of the Commission for a number of years in several separate proceedings to which the appellant was a party. The Railroad Commissioners of Florida, in pursuance of their statutory duty and authority, instituted the present proceedings against all of the railroads in the State for the purpose of unifying throughout the State the gathering rates. The Interstate Commerce Commission, after bringing before it all the records in the previous investigations, gave notice of further hearings and took a vast amount of additional evidence. In all of those investigations the appellant was represented before the Commission by its present counsel, who was assisted by its officers, traffic officials and other agents, and the voluminous records before the Commission consist principally of matter which they offered.

The appellant has stipulated out of the record all of the evidence taken by the Commission in the previous proceedings. It has further stipulated that the court may refer to the reports of the Commission as correct statements of the issues and facts of those proceedings. The statements attributed to counsel and the Commissioner taking the evidence in December, 1909, that the appellant's rates were not involved in those proceedings are not in the present record. The alleged statements are of no consequence or counsel would not have stipulated them out. The absence from the opinion of the Commerce Court, which reviewed fully all of the evidence and the various proceedings before the Commission, of any reference to the alleged statements is conclusive that they were not seriously pressed at the hearing. It is now

beyond the power of the appellant to shake the presumptions in favor of the validity of the order.  *Chi., R. I. & Pac. Ry. Co.* v. *Int. Com. Comm.*, 218 U. S. 88, 110, 111.

The order is also effective against the Atlantic Coast Line and the Seaboard Air Line companies.  During the season of 1910, the Atlantic Coast Line handled 2,901,936 boxes of citrus fruits and 1,500,000 miscellaneous crates; total, 4,401,936.  The Florida East Coast handled 669,584 boxes of citrus fruits, 600,000 crates pineapples, and 1,890,000 miscellaneous crates; total, 3,159,584.  The Seaboard Air Line handled 780,387 boxes of citrus fruits and 1,391,335 miscellaneous crates; total, 2,171,722.  In the volume of traffic handled the appellant stands between the Atlantic Coast Line and the Seaboard Air Line.  They appeared before the Commission with the appellant, occupied similar positions, had similar interests at stake, and were accorded the same treatment.  Those companies forthwith published the reduced rates and have since maintained them without protest.  Neither company joined in the petition before the Commerce Court and, while at all times cognizant of the litigation which would inure to their benefit if successful, neither has ever intervened.

The present order of the Interstate Commerce Commission unified the gathering charges on citrus fruits, vegetables and pineapples throughout the entire State of Florida.  The rates from the west coast, traversed by the Atlantic Coast Line and the Seaboard Air Line, are not contested.  If the court annuls the present order of the Commission and allows the appellant to restore its former rates, a drastic discrimination will result, and the shippers on the east coast will be at an advantage over the shippers on the west coast.

Appellant's railroad consists of two sections: (1) the line and branches from Jacksonville to Homestead, consisting of 506.47 miles, or the main line; (2) the line over

the Keys from Homestead to Key West, consisting of 122 miles, or the Over-Sea Extension; total, 628.47 miles. The capitalization of the entire mileage consists of $10,000,000 of first mortgage bonds, $21,000,000 of second mortgage bonds, and $5,000,000 of stock; total $36,000,000; of this, $15,000,000 applies to the main line and $21,000,000 to the Over-Sea Extension. The entire capital stock is and always has been owned by a single individual and no stockholders' meeting was ever necessary to determine his action. The cost of the Over-Sea Extension was approximately $175,000 per mile, or about $21,000,000. The Keys are undeveloped, vegetation will not grow because of blight resulting from the salt water, and there is little or no population. The act of the legislature of Florida authorizing its construction recites that it is desirable and important to the State to secure a fair proportion of the traffic passing through the Panama Canal. It is conceded that the handling of the cars from the north into southern Florida, the loading of the cars, the handling of the citrus fruits, vegetables and pineapples, and the shipping thereof from southern Florida to the north, were not even among the considerations which resulted in the construction to the south of the Over-Sea Extension.

For the year ending June 30, 1911, the net operating revenue from the main line was $1,272,908.19. According to the showing made by appellant that sum would more than pay a dividend of 8 per cent on the capitalization of $15,000,000 for the main line, and would more than pay a dividend of 4 per cent on the total bonded indebtedness of $31,000,000 for the entire system. The ordinary rate of interest on railroad stocks and bonds is less than 8 per cent, and runs from 4 to 5 and 6 per cent. The reasonableness of the rates paid by the growers and shippers of southern Florida, whose freight is transported northward, should not be tested by a return of 8 per cent, or by any per cent, on the fair value of 122 miles of railroad built

southward over the barren Keys at a cost of $175,000 per mile, and which does not pay operating expenses, for the purpose of securing business from the Panama Canal, not yet opened, or for some other purpose, though confessedly not for the use of those shippers. *Covington Turnpike Co.* v. *Sandford,* 164 U. S. 578, 596; *Int. Com. Comm.* v. *Un. Pac. R. R. Co.,* 222 U. S. 541, 549.

On the subject of confiscation the absence of the Atlantic Coast Line and the Seaboard Air Line companies from the case is again significant. As to them the rates have been published without protest and maintained as just and reasonable rates for similar transportation services. The railroads of those companies were built upon lands open to development where traffic may be secured. If the appellant erred in its judgment in building a railroad at such enormous cost over the barren Keys, into the Atlantic Ocean, the growers of the State of Florida who ship in the opposite direction should not be called upon to pay the bill

*Mr. Charles W. Needham* for the Interstate Commerce Commission:

The order does not violate the provisions of the Constitution of the United States guaranteeing due process of law and requiring that just compensation be paid for property taken for public use.

Confiscation cannot be predicated on a reduction of total revenue of the carrier caused by an order of the Commission reducing a single rate or rates upon a particular traffic.

The Commission, in the proceeding in which the order was entered, conformed to statutory authority.

In support of their contentions, see *Florida Shippers' Protective Assn.* v. *Atl. Coast Line R. R. Co.,* 14 I. C. C. 476; *S. C.,* 17 I. C. C. 552; *Den* v. *Hoboken Land Co.,* 18 How. 272; *Twining* v. *New Jersey,* 211 U. S. 78; *Reeves*

v. *Ainsworth,* 219 U. S. 296; *United States* v. *Grimaud,* 220
U. S. 506; *Blinn* v. *Nelson,* 222 U. S. 1; *United States* v.
*B. & O. S. W. R. R.,* 222 U. S. 8; *Standard Oil Co.* v.
*Missouri,* 224 U. S. 270; *Jordan* v. *Massachusetts,* 225
U. S. 167; *Procter & Gamble* v. *United States,* 225 U. S.
282, 297; *Int. Com. Comm.* v. *U. P. R. R. Co.,* 222 U. S.
541, 547; *Int. Com. Comm.* v. *Ill. Cent. R. R.,* 215 U. S.
452; *Arkansas Rate Case,* 187 Fed. Rep. 290; *Reagan* v.
*Farmers' L. & T. Co.,* 154 U. S. 362, 397; *Smyth* v. *Ames,*
169 U. S. 466, 541, 544, 547; *St. L. & San F. Ry.* v. *Gill,*
156 U. S. 649, 657, 665; *Minneapolis &c. Ry.* v. *Minnesota,*
186 U. S. 257, 266, 268; *Covington Turnpike Co.* v. *Sand-
ford,* 164 U. S. 578, 594; *Tex. & Pac. Ry. Co.* v. *Abilene
Cotton Co.,* 204 U. S. 426, 444; *Southern Ry. Co.* v.
*St. Louis Hay Co.,* 214 U. S. 297, 301; *Int. Com. Comm.* v.
*Burnham,* 218 U. S. 88, 111; *Atl. Coast Line* v. *Nor. Car.
Corp. Comm.,* 206 U. S. 1, 24, 25; *Int. Com. Comm.* v.
*Chi., R. I. & P. Ry.,* 218 U. S. 88, 102; *Int. Com. Comm.*
v. *Chi., B. & Q. R. R.,* 218 U. S. 113; *Ill. Cent. R. R. Co.*
v. *Int. Com. Comm.,* 206 U. S. 441; *Cincinnati &c. Ry.* v.
*Int. Com. Comm.,* 206 U. S. 142, 154; *Int. Com. Comm.* v.
*Un. Pac. Ry. Co.,* 222 U. S. 415, 446.

*Mr. Frederick M. Hudson* for the Railroad Commission-
ers of Florida:

This case is not controlled by *Smyth* v. *Ames.* It is not a
case in which the value of the property is the proper basis
of calculation as a test of reasonableness. Petitioner's
theory of the case is therefore wholly erroneous.

The cost of the service rendered would have been a
sounder basis of calculation in this case, and petitioner
has not met that requirement.

Petitioner might have used the average freight receipts
as a test, but has not met that requirement.

Even if this case were controlled by *Smyth* v. *Ames,* the
petitioner is not within the terms of that rule because

there is no separation or apportionment of interstate and intrastate business.

Even if this case were controlled by *Smyth* v. *Ames* the petitioner is not within the terms of that rule because its theory of the case assumes that the carrier is entitled to a profit on its investment regardless of qualifying circumstances.

*Mr. A. A. Boggs* filed a brief for the Florida Fruit and Vegetable Shippers' Protective Association and the East Coast Fruit and Vegetable Growers' Association, intervening appellees.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

The order of the Interstate Commerce Commission concerning which the appellant, hereafter called the East Coast Line, complained before the court below and which that court refused to enjoin was made on a second supplemental petition presented in controversies which had been long pending and twice before decided, such controversies involving many railroads and being concerned with the rates as to pineapples, citrus fruits and vegetables from places of production in Florida to exterior points of distribution or consumption. While the report here under consideration made on the second supplemental petition deals with only a few of the railroads concerned in the previous inquiries and with only a part of the controversies involved in the previous cases, yet the reports in the previous cases and the reasons stated by the Commission for its action in those cases are so connected with its action complained of in this case that it is impossible to understand this controversy without recurring to and stating the previous reports of the Commission in the controversies to which we have referred.

We observe before coming to make that statement that none of the testimony taken before the Commission in the cases prior to this one is in the record, it having been stipulated that the facts stated by the Commission in its reports in such previous cases should be taken as the facts of such controversies. For the purpose of the statement which we shall make the record therefore consists of the reports in such previous cases, of the report in this case and the testimony taken in this case before the Commission and in the court below. The future application of the facts which we shall state will be facilitated by giving a description of the East Coast Line as stated in the several reports of the Commission to which we shall immediately recur.

The East Coast Line is wholly within the State of Florida, the main line extending from Jacksonville south along the Atlantic coast to Miami, a distance of 366 miles, then to Homestead, 28 miles south, and thence across the Florida Keys to Key West. At the time of the final hearing before the Commission on March 2, 1911, the road was not fully constructed and was only completed and being operated to Knight's Key, about 83 miles below Homestead. The total mileage of the road was about 583 miles, including 477 miles of main line from Jacksonville to Knight's Key and about 106 miles of branch line above Miami. The cost of the construction from Homestead on was enormous, amounting to nearly $175,000 per mile, and the total cost of the extension from Homestead to Knight's Key, 83 miles, nearly equalled the entire cost of the balance of the road, 500 miles. On July 3, 1907, a petition was filed by the Florida Fruit & Vegetable Shippers' Protective Association against the Atlantic Coast Line, the Seaboard Air Line and Southern Railway Companies and the East Coast Line complaining of and asking a reduction in interstate rates on pineapples, citrus fruits and vegetables. The East Coast Line was the only one

of the defendant railroads whose traffic was confined to the producing regions in Florida because while the other lines also undoubtedly penetrated to the area of production, their lines were not confined to Florida but were trunk lines carrying not only the product committed to them by producers in Florida, but also the products committed by producers to roads like the East Coast Line which did not extend beyond Florida and had therefore to be transshipped if destined to points beyond the State by other roads. In coming to make its report in the case thus referred to, the Commission thus stated the general situation of the railroad traffic of all the roads in Florida concerning the subjects under discussion (No. 1168, 14 I. C. C. 483):

"The shape and location of the state of Florida is such that these railroads which handle this traffic from the point of production up to the base point necessarily do but a limited business. They extend south considerable distances through a sparsely settled country which neither originates nor consumes a considerable amount of traffic. Some of them reach the seacoast, but none of them connect or can connect with railroads leading beyond, and the amount of through business handled is extremely light. Their traffic is confined almost entirely to bringing out the products which originate upon their lines, and carrying in the supplies which are consumed in the territory served by them. Fruits and vegetables, lumber, naval stores, and in some cases cotton and phosphate rock are the principal commodities carried, and of these, fruits and vegetables produce the most revenue."

In the report by which the Commission disposed of this controversy (No. 1168, 14 I. C. C. 476) it divided the rates to be considered into two classes: (a) gathering charges from production points in Florida to base points of which Jacksonville was the only one on the East Coast Line, and (b) rates from base points to points of final

destination in other States, the sum of the two rates being the joint through rate.

Considering the three products whose traffic charges were under consideration, the Commission said:

(a) Citrus fruits:

"From an examination of the elaborate figures which were introduced upon the trial showing the character of the traffic handled by these Florida roads, the conditions under which it is handled, their earnings, and the cost of operation running through a series of years, it is difficult to see how these railroads can be expected to transport in a suitable way this fruit and vegetable traffic from points of production to these basing points for a less sum than they now receive. It is difficult to see how, even upon the present traffic, those lines can in the immediate future expect to pay any considerable return upon their investment. We feel that these local rates, although they are high in comparison with other local rates, are as low as should be established under all the circumstances." (p. 484.)

(b) Vegetables:

"The same observations which have been made upon the orange rates to base points apply with equal pertinency to those upon vegetables. They are named by the railroad commission of Florida. They are made with the understanding that they are really parts of through rates from the point of production to the market of consumption. They are low in comparison with other rates because it is understood that this industry is an important one to the State of Florida, and that a low cost of transportation is essential to its development.

"While these local rates are essentially part of the through charge and should be dealt with by this Commission as such, it is difficult to see how these Florida railroads can render a proper service upon a lower scale of rates than is now applied. It must be remembered that without the railroad this industry could not exist at all, and that

to its satisfactory carrying on the character of the service is fully as important as the rate. It is better that these fruits and vegetables should reach the market on time, and in good condition, than that a few cents per box should be subtracted from the carrying charge. There was very little complaint as to the service; nor did the shippers who testified manifest any desire that these carriers should be required to accept less than reasonable compensation for that service. Our conclusion upon this branch of the case is that the present rates up to the base points, while high in comparison with similar rates in other localities are as low as they ought to be under the conditions obtaining upon these Florida lines, so that here, as in case of oranges, the real question arises upon the rate from the base point to the northern market." (p. 496.)

(c) Pineapples:

"Pineapples are mainly produced in Florida, upon the line of the Florida East Coast Railway, which extends, as already said, down the east side of Florida. This industry has within recent years developed rapidly. Florida pineapples today sell in all the markets of the United States in competition with foreign pineapples, usually commanding much higher prices than the foreign article. While the period of production in the United States and in Cuba is not exactly the same, still it may fairly be said that the two products do compete.

"It was said that Jansen might be selected as a typical producing point upon the Florida East Coast Railway. This station is 257 miles south of Jacksonville and the rate on pineapples is 24 cents per box of 80 pounds. Rates from other points are relatively about the same as from Jansen; somewhat lower, it will be seen, for the same distance, than from most producing points upon oranges." (p. 502.)

Presumably, deeming that the particular situation on the East Coast Line as to the character of its business, its

location, its cost, etc., etc., required to be specially pointed out in addition to what was said in the passages quoted, the Commission said:

"The Florida East Coast Railway was built as part of a hotel scheme, and its principal business is the carrying of passengers who frequent these Florida winter resorts. Over 50 per cent. of its total receipts are from passenger traffic. Its most important freight business is the transportation of fruits and vegetables, and of these pineapples afford the most considerable amount of revenue. The management of the railroad has paid great attention to the development of this business. In the pineapple region highways are few and transportation by wagon is therefore costly. To relieve this difficulty sidings have been put in the pineapple region at frequent intervals. The traffic representative of this railroad stated that it was possible to load pineapples every half mile upon his line in the pineapple-producing region. When once loaded great attention is paid to sending the fruit to Jacksonville upon a reliable and expeditious schedule.

"Very elaborate tables were introduced showing the cost of constructing this railroad and the financial results of its past operations. These statements and tables have been examined by the Commission, but it does not seem necessary to reproduce them here or to state in detail the grounds of our conclusions. But for this railroad the pineapple industry in Florida would not today exist. The quality of the service rendered that industry by this road is not criticised. The shippers of this fruit ought not to object, nor do they object to paying a fair compensation for the service, and in our opinion the present rates do not exceed such just compensation for the transportation of pineapples from various producing points to Jacksonville, and we so hold." (p. 503.)

And concerning the earnings of the East Coast Line, it was said:

"The total earnings of the Florida East Coast Railway for the same year (ending June 30, 1907) were $5,911 per mile, and its operating expenses $4,502. The greater part of the receipts of this railroad are from its passenger service. The evidence shows that a considerable portion of what little freight revenue it has comes from the transportation of fruits and vegetables. It has given in the past great attention to this service, and has apparently satisfied its patrons in this respect. It makes no through rates, but receives its full local in all cases up to Jacksonville." (p. 484.)

Giving effect to the foregoing, the Commission held that the complaint as to gathering charges was wholly unfounded, and they were maintained. A different conclusion, however, was reached as to charges from the base points to points of distribution or consumption, as to which some reduction was made. It consequently follows that all the other roads who were defendants were subjected to some reduction as to their rates, while the East Coast Line because of its being a purely gathering road was subjected to no reduction whatever.

Within a year after this action by the Commission the same complainant commenced a new proceeding (No. 2566) against two hundred railroads, including among others the East Coast Line, to establish carload rates from base points in Florida to interstate points. At the same time in No. 1168, which as we have seen had been previously passed upon by the Commission and decided in favor of the East Coast Line, a supplemental petition was filed against that road, the sole complaint against the East Coast Line in such petitions being as to its gathering rates on pineapples from points of production to Jacksonville. And it is to be presumed that the complaint as to pineapple-gathering rates was made only against the East Coast Line because as we have seen, as stated by the Commission, that road was almost the exclusive carrier of such

product, and in fact had virtually built up that industry. The controversy while it involved a claim of reduction, in its broad aspect presented only a controversy as to whether there should be put in force carload and less-than-carload instead of any-quantity rates in the performance of its duty of gathering pineapples. On the filing of the new and original as well as of the supplemental petition the Commission directed the rescinding of its previous order concerning the reasonableness of gathering rates, as well as its finding on the subject of rates from base points and directed the matter to be reheard. Without referring to the conclusion of the Commission concerning the controversy as to the many railroads who were before it as to their interstate rates, we come to state the ruling of the Commission as to the East Coast Line (17 I. C. C. 552, 564):

"The evidence produced upon the present hearing suggests no change in what was said so far as that applies to the Florida East Coast Railway. That line operates at the present time 477 miles of main line and 106 miles of branches. It has a first mortgage of $10,000,000, a second mortgage of $20,000,000, and a capital stock of $3,000,000, making in all $33,000,000. This capitalization, with the exception of about $4,000,000, represents an actual cash investment.

"It is urged by the complainant that the portion of the line from Miami south, which has cost some $14,000,000, was not at the present time a paying investment and that the balance of the line from Jacksonville to Miami, which is used by the growers of pineapples, ought not to be taxed with the cost of this construction. Admitting this to be so and laying out of view altogether the $14,000,000 which have been invested in that part of the property, it is still true that during the entire existence of the Florida East Coast Railway, so far as this record shows, that property has never earned in any single year 6 per cent. upon the money invested, with the single exception of the year 1909.

During much of the time its net earnings have been but little above its operating expenses. We certainly cannot hold that these rates should be reduced because for a single twelve months, under what may be termed abnormal conditions, this railway earned about 6 per cent. on the money which has been actually invested in its construction. The years when no return has been received must certainly be given some consideration. Upon no other theory could private capital be induced to invest in the construction of railroads.

"While, however, we adhere to what was said in the previous case, we do think, upon more careful examination, that these rates of the Florida East Coast Railway on pineapples ought to be somewhat revised. They are not consistent with one another, and in our opinion those from the more distant points are too high as compared with rates from nearby points.

"The present rates are in any quantity. About 60 per cent. of these pineapples move from the point of origin in carloads, 40 per cent. in less than carloads. Carload shipments are stripped and loaded by the shipper and are not unloaded at Jacksonville, which probably saves the carrier not far from 2 cents per box. The less-than-carload shipment is loaded by the railway and usually unloaded at the station in South Jacksonville or Jacksonville. In our opinion carload rates should be established which are less than the present any-quantity rates by 3 cents per box.

"The establishment of such carload rates will not of a certainty work a decrease in the net earnings of the carriers. It is a false theory of transportation which seeks to force the shipper to avail himself of a less-than-carload service, which is more expensive to render, for the purpose of increasing the gross revenues of the carrier. The true object should be to perform the service in the most economical manner and to charge for that service reasonable compensation. In the end this makes to the advan-

tage of both the carrier and its patron. The vice-president of the Florida East Coast Railway stated that he had always thought that carload rates should be established and that in his opinion to establish carload rates 3 cents per box less than the present any-quantity rates would not prejudice the net revenues of his company, since he would make up by saving in operating expenses what he lost in gross income."

The order of the Commission which gave effect to these views entered February 8, 1910, changed gathering charges on pineapples and citrus fruits on the East Coast Line from any-quantity to carload and less-than-carload rates and modified the mileage basis. On attention being directed to the fact that the complaint related only to pineapples, while the order applied to that product and to citrus fruits, the order was modified and restricted to the subject complained of, pineapples. The East Coast Line conformed to the order and indeed shortly after doing so also voluntarily put into effect carload and less-than-carload gathering rates on citrus fruits and vegetables, and although the rates thus fixed were somewhat higher than the rates on pineapples which the Commission had established, they were lower than the citrus fruit and vegetable rates which had been expressly sustained by the Commission. Some months after this was done the same complainant who had filed the previous petitions presented in No. 1168 a second supplemental complaint against the East Coast Line, and new petitions against the Seaboard Air Line and Atlantic Coast Line Railways (No. 3808). So far as the East Coast Line was concerned the complaint was against the citrus fruit and vegetable-gathering rates and asked that they be equalized with or made the same as the pineapple rate. The Florida Railroad Commission intervened and asked the same relief. The Commission in effect granted the prayer of this second supplemental complaint, found the rates of the East Coast Line on

citrus fruits and vegetables to be unjust and unreasonable, and directed the putting into operation of a lower stated schedule of gathering rates which was made applicable not only to the East Coast Line but also to the other roads which were parties to the proceeding. And it is this order which the railroad refused to obey and to enjoin the enforcement of which this suit was brought.

Without going into detail it suffices to say that the report of the Commission concerning the action just stated did not purport to question the correctness of its previous findings sustaining the citrus fruit and vegetable rates of the East Coast Line, but was based upon what was deemed to be a change in conditions since the previous decisions. After pointing out that it had previously ordered a change from any-quantity to carload and less-than-carload rates on pineapples from gathering points to the base point on the East Coast Line and on all fruits and vegetables from base points outward, and that on both the Atlantic Coast Line and the Seaboard Air Line any-quantity rates yet remained from gathering points as to all fruits and vegetables, although such was not the case as to the East Coast Line because of the change which it had voluntarily made, it was said (22 I. C. C. 11, 14, 15):

"No material change has taken place since then (that is, since the previous decisions) so far as this record discloses which would lead to a different conclusion if the same subject were before us today. The volume of business transacted has increased, but the expenses of operation have also increased to an extent which offsets the greater amount of business. . . .

  *    *    *    *    *    *    *    *

"It appeared in the original case that citrus fruits to some extent, and vegetables to a much greater extent, were shipped in small lots to Jacksonville and there reloaded for movement beyond. It was our impression in

establishing carload rates from the base point that this
would permit the movement in small lots up to the base
point and the consolidation at such point, and that the
carload movement would in fact be mainly beyond the
base point. Such has not been the result. In order to
obtain the carload rate beyond the base point it seems to
be necessary for the shipper, in actual practice, to present
a full carload at the point of origin, and from this it follows
that the movement up to the base point at the present
time is entirely different from what it was when we
approved these any-quantity rates. At that time the
loading was by the carrier; now it is mainly by the shipper.
The loading of the cars from the point of origin to the
base points is much heavier now than formerly. In 1907
the average loading of citrus fruits and pineapples upon
the Atlantic Coast Line up to the base point was 215
boxes. In 1910 this loading had increased to 279 boxes.
In case of vegetables the increase is even more marked.
The number of cars now required to transport the same
amount of this traffic from points of origin to base points
would be materially less than in 1908. Otherwise stated,
it costs the shipper more to handle his business today and
it costs the railroad less."

And upon that changed circumstance an order was
awarded directing the change from any-quantity to car-
load and less-than-carload and fixing a rate which was the
same as that previously fixed for pineapples. Of course,
as the East Coast Line had voluntarily put in carload and
less-than-carload rates, it was only affected by this order
to the extent that it lowered the traffic charge as con-
tained in the schedule which had been previously vol-
untarily established.

It is insisted that the order of the Commission was
wrongful and that the court below erred in not restraining
its enforcement for the following reasons: (a) because the
order complained of was rendered without any evidence

whatever to sustain it; (b) because it confiscated the property of the railway in a two-fold aspect, first, by fixing a rate so unreasonably low as to afford no remuneration to the corporation for the use of its property, and second, because although the Commission in order to justify the rate which it fixed took into account the revenue derived from the extended road, it nevertheless declined to at all consider the value of the extended road and the right to earn a return thereon. We come as briefly as possible to consider these contentions separately.

(a) *That there was no evidence whatever tending to sustain the reduction of the rates on citrus fruits and vegetables as to the East Coast Line which the Commission ordered.*

While a finding of fact made by the Commission concerning a matter within the scope of the authority delegated to it is binding and may not be reëxamined in the courts, it is undoubted that where it is contended that an order whose enforcement is resisted was rendered without any evidence whatever to support it, the consideration of such a question involves not an issue of fact, but one of law which it is the duty of the courts to examine and decide. (*Int. Com. Comm.* v. *Louis. & Nash. R. R.*, 227 U. S. 88, 91, 92, and cases cited.)

In view of what we have said concerning the state of the record, the solution of the question must depend upon an examination and analysis of two subjects, the one the reports of the Commission in the previous cases, and the other, the testimony which was before it and the report made in this case. As to the first, in view of the statements made by the Commission in its report in the original case (No. 1168, 14 I. C. C. 476) as to the earning power of the road, the nature of its business and the reasonableness of its rates and the express finding that the citrus fruit and vegetable rates were just and reasonable and should not be changed and the further fact that they were not called in question in the second proceeding it

follows that the inquiry narrows itself to the mere consideration of the testimony taken in this proceeding, and the report of the Commission in such proceeding, and the testimony taken before the court below in so far as it is proper to consider it in connection with the particular question under consideration. But coming to make a review of the testimony before the Commission on the issue raised by the second supplemental petition, we fail to find the slightest proof tending to sustain the reduction in rates as to the East Coast Line, which was made.

There are only three subjects referred to in the testimony which can in any view be considered as having any possible tendency to show such a change as would cause the rate which was found by the Commission in the past reasonable and not to justify a change to be unreasonable and therefore require reduction. The three subjects are these: (a) testimony by the chairman of the Florida Railroad Commission that there had been a considerable increase in the volume of traffic in citrus fruits and vegetables since the previous finding; (b) a further statement or admission made by an officer of the East Coast Line in a colloquy which took place at the hearing in this case to the effect that as shippers under carload rates loaded their own cars there was some difference in cost to the advantage of the road over the cost of loading when the any-quantity rates prevailed; (c) testimony with reference to the Atlantic Coast Line and the Seaboard Air Line (but none as to the East Coast Line) to the effect that on those roads it had come to pass that there was a saving in expense and an increase in earning capacity because even under the any-quantity rates carload shipments had greatly increased and cars so shipped were much more heavily loaded and moved from the point of production through the base point to their ultimate destination, when such was not the case at the time the previous order was made. Testimony which as we have seen was expressly

declared by the Commission to be in effect the cause which gave rise to the reduction.  But at once it is to be observed that so far as any inference alone from the difference between carload and less-than-carload rates and any-quantity rates is concerned it had no application to the East Coast Line since that road had put in the carload and less-than-carload rates while the other two roads had not. And so far as the consideration of the increased loading is concerned as stated by the Commission, whatever may have been the proof as to the Seaboard Air Line and the Atlantic Coast Line, it is beyond controversy that no such proof can be found in the record as to the East Coast Line except the vague intimation to which we have referred.

Thus by analysis the case comes to this: Did the facts as to the increased loading which the Commission found to exist in the case of the Seaboard Air Line and the Atlantic Coast Line support or tend to support the order as to the East Coast Line in the absence of all testimony in the record concerning the existence of such fact as to the traffic on that road?  In other words, the question is, Because there was testimony as to the traffic of those roads, can such testimony be said to tend to establish the same condition on the East Coast Line?  Conceding that from an abstract point of view an affirmative answer would have to be given to such question we think such is not the case here for the following reasons: (a) because of the difference in business carried on by the two roads named and the East Coast Line, they being not only gatherers of the local product but trunk line carriers; (b) because of the difference in the situation and traffic of the two trunk lines named and the East Coast Line, as deduced solely from the peculiar environment and movement of business on that road so aptly stated in the passages from the reports of the Commission which we have quoted.  Differences which presumably gave rise to

separate statements in the previous reports in considering that road. While we do not say that the conclusion is affirmatively sustained, nevertheless we think the state of the record at least tends to give some support to the suggestion in the argument that the greater magnitude and importance of the consideration of the business and rates of the two trunk line carriers concentrated attention in that direction and therefore caused the inquiry on that subject and the facts concerning the same to eclipse the distinctions between those lines and the East Coast Line—distinctions which if otherwise taken under consideration should have produced a different result.

As it follows from these views that the order in question as to the East Coast Line and its enforcement should have been enjoined by the court below, our duty is to reverse the action of that court and to remand the case to the proper District Court with directions to grant the prayer of the East Coast Line and restrain the enforcement of the order in question and it is so ordered.

*Reversed.*