**SCANDRETT et al. v. UNITED STATES.**

No. 241.

District Court, D. Oregon.

April 30, 1940.

J. N. Davis and Thomas H. Maguire, both of Seattle, Wash., for Scandrett, Cummings and Haight.

R. S. MacFarlane, Dean H. Eastman, and Earl F. Requa, all of Seattle, Wash., for Northern Pac. Ry. Co.

Carey, Hart, Spencer & McCulloch and Fletcher Rockwood, all of Portland, Or., for Spokane, P. & S. Ry. Co.

Roy F. Shields and L. W. Hobbs, both of Portland, Or., for Union Pac. R. Co.

Elmer B. Collins, Sp. Asst. to Atty. Gen., and Carl C. Donaugh, U. S. Atty., of Portland, Or., for the United States.

Nelson Thomas, of Washington, D. C., for the Commission.

Johnston B. Campbell, of Spokane, Wash., and Edwin D. Hicks and William B. Adams, both of Portland, Or., for intervenors Inland Empire Waterways Ass'n and others.

Ridgway, Johnson, Kendall & Stephan, of Portland, Or., for intervenor Inland Empire Petroleum Transp. Co.

Robison & Shaw, of Portland, Or., for intervenor International Brotherhood of Teamsters', Chauffeurs, Stablemen and Helpers.

Before HANEY, Circuit Judge, and JAMES ALGER FEE and McCOLLOCH, District Judges.

HANEY, Circuit Judge.

This suit was brought to set aside an order of the Interstate Commerce Commission which suspended tariffs and schedules of rail rates on petroleum products filed by petitioners.

Petitioners filed a tariff with the Interstate Commerce Commission on March 10, 1939, known as Supplement No. 5, and on the following day filed an additional tariff, known as Supplement No. 6, which reduced rates on shipments of refined petroleum products in bulk from origin points in Oregon and Washington to points in Oregon and Washington east of the Cascade Mountains, to points in Northern Idaho, and to Nelson, British Columbia. The origin points included Portland and Linnton, Oregon, and Longview, Hoquiam, Tacoma, Seattle, Richmond Beach, Everett and Bellingham, Washington, and are also referred to as marine storage points. For example of the reduction, the tariffs disclosed a rate of 25¢ per 100 pounds from marine storage points to Spokane, Washington. The pre-

vious rate had been 41¢ per 100 pounds. There were corresponding decreases to other destination points.

Various protests were filed against the rates, and on April 8, 1939, the Commission entered its order suspending the operation of the tariffs until November 10, 1939, and initiated an investigation as to the lawfulness of the rates and tariffs. After hearing the Commission made a report and an order requiring cancellation of the tariffs on or before November 9, 1939. The present suit was instituted to set aside such order.

The report of the Commission discloses that the cause of the rate changes is the construction and operation of independent oil refineries at Spokane and in Northern Montana. The California refineries had little competition in the Inland Empire. Beginning in 1938, the inland refiners began making inroads in the business of the California refiners because of their proximity, principally, since they could reduce prices. The California refiners advised the railroads and the truck lines that in order to meet the situation, rates must be reduced. The carriers took no definite action. The California refiners then decided to utilize the Columbia River. Some of them began construction of storage facilities at Umatilla, a point on the Columbia River about 200 miles east of Portland, Oregon, with the view of using river boats for movement of petroleum products to Umatilla, and trucks for movement of such products from Umatilla to various points in the Inland Empire.

When the railroads became aware of such plans they discussed the matter with the California refiners, and inquired what rates would be necessary in order to hold the traffic to the rails. They were advised that the rate should not be over 25 cents per 100 pounds and possibly as low as 22.5 cents from marine storage points to Spokane, because the river rate from Portland to Umatilla or Attalia, a Columbia River point about 27 miles up river from Umatilla, was 7.5 cents, and common carrier truck service from those points to Spokane would be 17 cents, although by private truck, the cost would be about 15 cents. The railroads thereupon filed the tariffs in question upon such basis.

The Commission found "that the proposed rates are compensatory, considering all costs" and stated generally that the problem was "to determine what incentive the rail lines must afford the California refiners to create that equality of opportunity which should fairly apportion the traffic between the rail lines and the river-truck routes". It considered what the cost to the California refiners would be to Spokane by the river-truck route. Regarding the first portion of the journey, Portland to Umatilla or Attalia, it said: "We are not convinced that the 7.5-cent rate to Umatilla has yet reached that degree of permanence and stability which would warrant us in recognizing it as the controlling river factor. It is based more on judgment than on the hard lessons of experience. There is a strong possibility that unforeseen circumstances may require it to be increased. Looking to an indefinite future period, we feel that it would be safer to here figure on a 9-cent port-to-port rate * * *."

The Commission further stated: "To the 7.5-cent, or 9-cent river rate must be added the cost of putting the traffic through the storage and transfer facilities at the head of navigation, for no similar cost is incurred on traffic which moves by rail or truck directly from the north-coast ports." This cost was estimated at 1.5 cents by one witness and the Commission assumed that figure for purposes of discussion. Incidental items were placed at ½ cent.

Regarding the truck-rate from Umatilla or Attalia to Spokane, the Commission states that by private truck, the cost would be 15 cents, and that while a 17 cent rate was probably compensatory for carrier trucks, such rate "would have an undue tendency to break down the rate structure and that a 19-cent rate should be adopted as a minimum". It stated, in this connection, that the shippers would prefer to use carrier-truck service.

The Commission also found that while the river-truck service required a little more time than all truck or all rail service, it was inconsequential, and that insofar as the shippers were concerned, they had no preference as to the type of service, if costs were equal.

In summing up the factors involved the Commission stated that the situation was one "where carriers by rail, by highway, and by water are engaged in a competitive struggle over an important form of traffic"; that to "the most important destination point, Spokane, the evidence justifies conclusions that the proposed rail rate of 25 cents from the north-coast ports would yield some margin over full costs; that the motor carriers could, with a heavy volume of traffic, make both ends meet on a rate at

17 cents from Umatilla and Attalia to Spokane; and that it is possible that the water carriers, likewise with a heavy volume of traffic, might be able to operate without loss on a 7.5-cent rate from Portland to Umatilla and Attalia, allowing nothing for terminal expense at those river ports or for marine insurance".

As particularly revealing of the Commission's theory of decision, we quote the following two paragraphs therefrom:

"We were given power to fix minimum rates, however, primarily for the purpose of preventing destructive competition in rates and promoting the financial stability of the transportation agencies. Our duty in the exercise of that power is not done, therefore, if we allow competitive rates to gravitate to the lowest possible level. Minimum rates should be fixed, if it can be done, at levels which are consistent with some degree of carrier prosperity; and in so fixing them we ought to be able to count on the cooperation of the shippers, because reasonable prosperity for the carriers is in the final analysis to the advantage of those whom they serve.

"These principles we have had in mind in our findings in these proceedings. If we were to assume that the shippers of petroleum products would use every means in their power to bring down their transportation costs to the lowest possible level, regardless of the effect upon the public carriers whose welfare is vital to the best interests of the country, we would go to a somewhat lower level of minimum rates. We do not believe, however, that such an assumption is justified, and in that disbelief we shall prescribe minimum rates which in our judgment will promote a somewhat healthier degree of prosperity for all the carriers concerned, by rail, by highway, and by water. A fair trial of such rates is, we are persuaded, clearly desirable."

Based upon the foregoing, the Commission found "that the proposed rail rates from the northcoast ports are below a minimum reasonable level and hence would be unlawful," and ordered the tariffs suspended without prejudice to the establishment of rates based on a river rate of 9 cents plus a half cent for incidental charges, plus approved truck rates beyond, which, to Spokane, were fixed at 19 cents or a total of 28.5 cents.

Petitioners allege that the order is void for a number of reasons, among which the principal ones are: (1) the Commission did not find that the tariffs violated any provision of the Interstate Commerce Act; (2) the order deprived petitioners of the right to use managerial judgment; (3) that the Commission was wrong in assuming its function to be to determine what rail rates "create that equality of opportunity which should fairly apportion the traffic between rail lines and the river-truck routes"; and (4) that the method used by the Commission (river rate plus incidental cost plus truck rate) was erroneous because: (a) rail carriers have inherent advantages because its operating costs are less; (b) the river rate figure used was 9 cents which was based on prophecy, despite evidence of the 7½ cent rate; (c) the truck rate should have been the cost of private trucking; and (d) it was based in part on a conclusion of the Commission that the refiners should not attempt to obtain the lowest possible rate.

Commission's Power as to Policy

Petitioners make a number of contentions, the soundness of which is to be determined by a decision of the question as to whether the Commission had the power to suspend the tariffs because they conflicted with a policy established by Congress. Petitioners assert that the rail carriers are free to exercise their discretion in meeting competition by establishing reduced rail rates, if such rates are compensatory and do not violate any provision of the Interstate Commerce Act; that the validity of such rates must be considered independently of their effect on nonrail competitors; that since there are no findings that the rates violate any provision of the Interstate Commerce Act, the Commission had no jurisdiction or power to suspend the tariffs.

Prior to the Transportation Act, 1920, the Commission was not empowered to fix minimum rates which could be charged, but only maximum rates. Skinner & Eddy Corp. v. United States, 249 U.S. 557, 564, 39 S.Ct. 375, 63 L.Ed. 772. When the bill which became the Transportation Act, 1920, was reported by the Committee, the report (House Report No. 456, 66th Congress, 1st Session, 1919, p. 19) stated that the Commission should be empowered to fix minimum rates, and: " * * * With this power the Commission could prevent a rail carrier from reducing a rate out of proportion to the cost of service, by establishing a minimum, below which such carrier could not fix its rate. It would also prevent a rail carrier from destroying wa-

ter competition between competitive points by prohibiting such carrier from so reducing its rates as to destroy its water competitor. Circumstances have been cited where the rail carrier destroyed its water competitor by such a reduction of rates as to make it impossible for the water carrier to survive. When once competition was thus driven off the rail rates would be restored or would rise to even higher levels * * *"

In accordance with this report the Transportation Act, 1920, was enacted. Act of February 28, 1920, Ch. 91, 41 Stat. 456. Section 418 of that act amended § 15 of the Interstate Commerce Act so that it provided, 49 U.S.C.A. § 15(1): "Whenever, after full hearing * * * the commission shall be of opinion that any individual or joint rate, fare, or charge whatsoever demanded, charged, or collected by any common carrier * * * is or will be unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of this chapter, the commission is authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate, fare, or charge, or rates, fares, or charges, to be thereafter observed in such case, or the maximum or minimum, or maximum and minimum, to be charged * * *."

By § 500, 49 U.S.C.A. § 142, it was provided in part: "It is declared to be the policy of Congress to promote, encourage, and develop water transportation, service, and facilities in connection with the commerce of the United States, and to foster and preserve in full vigor both rail and water transportation. * * *"

While it is true that petitioners have the right to initiate and determine for themselves in the first instance what the rates shall be,[1] the Commission is empowered to suspend such rates and fix minimum rates, if the proposed rates are unjust, unreasonable, unjustly discriminatory, unduly preferential, prejudicial, or violate some other applicable statute. 49 U.S.C.A. § 15(1). Even prior to the Transportation Act, 1920, the effect of the proposed rate on the carrier proposing it, was not the sole determining factor, for among other things, the Commission was to consider also the interests of the shipper and the public,[2] and the effect of competition[3] in determining the reasonableness of the rates.

By the Transportation Act, 1920, Congress established the policy to "foster and preserve" both rail and water transportation—the exact contrary to the destruction of competition between them. To that end, the Commission was empowered to fix a minimum of rates for the railroads so that the latter could not, by reducing its rates, put an end to the existence of water transportation. The danger that water transportation might destroy the railroads was apparently remote. In other words in the establishment of rates by the Commission, there was to "be impartial recognition and promotion of the interests of all". Mississippi Valley Barge Co. v. United States, 292 U.S. 282, 288, 54 S.Ct. 692, 694, 78 L. Ed. 1260. See also: Youngstown Sheet & Tube Co. v. United States, 295 U.S. 476, 55 S.Ct. 822, 79 L.Ed. 1553.

When carrier-truck service became a significant factor in transportation, the policy of equality among all carriers as to rates was extended by the Motor Carrier Act, 1935. Act of Aug. 9, 1935, Ch. 498, 49 Stat. 543. By § 202 of that act, 49 U.S.C.A. § 302, Congress declared: "It is hereby declared to be the policy of Congress to regulate transportation by motor carriers * * * improve the relations between, and coordinate transportation by and regulation of, motor carriers and other carriers * * *." Here again is an expression of policy to the effect that competition among carriers should be restricted to factors other than rates; that the services of each should be equalized to the extent that a shipper would not prefer another because of a cheaper rate. The Commission, we think, correctly stated its duty when it said that the question for determination was "what incentive the rail lines must afford the California refiners to create that equality of opportunity which should fairly apportion the traffic between the rail lines and the river-truck routes". In this connection, petitioners urge that it is not the function of the Commission to "apportion" the traffic. We do

---

[1] Interstate Commerce Comm. v. Chicago G. W. Ry., 209 U.S. 108, 119, 28 S. Ct. 493, 52 L.Ed. 705.

[2] Interstate Commerce Commission v. Cincinnati, N. O. & T. Railway Co., 167 U.S. 479, 511, 17 S.Ct. 896, 42 L.Ed.

243; Texas & Pac. Railway v. Interstate Com. Com., 162 U.S. 197, 234, 16 S.Ct. 666, 40 L.Ed. 940.

[3] Interstate Commerce Com. v. Alabama Midland Ry., 168 U.S. 144, 164, 18 S.Ct. 45, 42 L.Ed. 414.

not understand that the Commission did or intends to "apportion" the traffic. It merely equalized, by differentials, the prospects or opportunities for procuring traffic.

Petitioners contend that Ann Arbor R. Co. v. United States, 281 U.S. 658, 50 S.Ct. 444, 74 L.Ed. 1098, is authority for the proposition that § 500 of the Transportation Act, 1920, and § 202 of the Motor Carrier Act, 1935, are not applicable here. The statute in the case relied on is entirely dissimilar to the ones in the two acts mentioned. No policy of equalization is mentioned in the statute in the case relied on, but only "a hopeful characterization of an object", which object was to obtain "the lowest possible lawful rates" for agricultural products. Such object has no bearing upon a policy of equalization among carriers.

Petitioners further rely on the following from Mississippi Valley Barge Co. v. United States, supra, 292 U.S. at page 288, 54 S.Ct. at page 694, 78 L.Ed. 1260: "For the determination of this case there is no need to go into the question whether the declaration of the policy of Congress to foster rail and water transportation creates a new standard of duty for the Commission in the ordering of rates, or is a source of private rights if the duty is ignored. * * * The most that it can mean * * * is that where carriers by land and water are brought within the range of the regulatory powers of the Commission, as e.g., in establishing through routes or joint rates, there shall be impartial recognition and promotion of the interests of all."

Petitioners assert that since the water carriers and private truck carriers have not been "brought within the range of the regulatory powers of the Commission" the principle of equality is not to be considered. This language, we think, does not have the effect ascribed to it, but simply means that when the Commission regulates two different forms of carriers it should not be partial and should promote the interests of both. It was not meant that in other cases, the Commission should be partial, which is the effect of petitioner's contention.

We have purposely omitted consideration of the interests of the public because if the findings of the Commission as to the rates of each of the types of carriers is correct, the interest of the public is not a controlling factor, since a fair rate by any one of the carriers would amount to the same sum to the public. In other words, the interest of the public does not conflict with the policy of equalization. What the rule would be in a case where the interest of the public would conflict with such policy, as, e.g., a case where a fair rate for one carrier would be substantially less than a fair rate for another type of carrier, we have no occasion to determine. Compare: Petroleum from California to Oregon, 214 I.C.C. 668, 677; Petroleum Between Washington and Oregon Points, 225 I.C.C. 382. We are expressing our views in a case where the fair rates for the various types of carriers have a substantially identical effect on the public. In such case we think equality among such carriers must rule.

### The Findings

Petitioners make a contention that the order is void because of a lack of findings that the tariff violates some particular provision of the Interstate Commerce Act. The Commission found that the proposed rates "are below a minimum reasonable level" and since we hold that the Commission could lawfully make such a finding based on the ground that the proposed rates would violate an established policy of the lawmakers, this contention must fail.

Petitioners further contend that the evidence discloses the river rate to be 7.5 cents per 100 pounds, and when the Commission undertook to determine what the rate would be, it entered the domain of prophecy. We think the contention must fail. The evidence in favor of petitioners was that one of the two water carriers which could transport petroleum products, and which was "not in good financial condition", had made only four trips from Portland to Umatilla, its rate then being 7.5 cents per 100 pounds, and that such carrier was "willing to bind itself by contract to continue it as a maximum to Umatilla for as much as 5 years". Opposed to such evidence was the evidence that the rate of the other water carrier which "has strong financial support" was 13.5 cents per 100 pounds. An engineering expert estimated the first water carrier's costs in 1938 to be about 5 cents per 100 pounds to The Dalles, and about 5 cents additional from The Dalles to Umatilla; that the costs of the second water carrier was 12.9 cents per 100 pounds, and that the future costs, based on present river conditions and indications as to volume of traffic, would be about 10 cents per 100 pounds, although the rate might decrease to 5 cents upon improve-

ment of the river, use of proper equipment, and increase of volume of the traffic.

In this state of the evidence the Commission was not compelled to accept the rate of the first water carrier as conclusive. The argument that the Commission has prophesied as to the rates of the water carriers lacks substance in view of the absence of previous service. As said by the Commission, the 7.5-cent rate "is based more on judgment than on the hard lessons of experience". The Commission is not deprived of power to carry out the Congressional desires simply because it must of necessity predict a future event.

Considerable criticism is levelled at the Commission because of its statements that it would approve "a somewhat lower level of minimum rates" if it were justified in believing that the petroleum shippers "would use every means in their power to bring down their transportation costs to the lowest possible level, regardless of the effect upon the public carriers". Petitioners contend that the Commission thus acted as a soothsayer. When placed in the setting shown by the evidence, however, these statements lose their prognosticatory nature. The California refiners have built storage and other facilities at Umatilla at considerable expense. As stated by the Commission, those "which have been built at Attalia and Umatilla are permanent institutions, and the California refiners expect to use them, regardless of the rates here proposed by the railroads from the north-coast ports". The Commission further said that "the river facilities are not sufficient to take the entire movement and, at least for some time to come, much of the traffic will have to go by rail or by truck from the north-coast ports, even if the rail rates and the truck rates from those points are made higher than the river-truck rates". There is no suggestion that these evidentiary findings are not amply supported by the evidence.

While the Commission said that the "record is convincing that the great bulk of the traffic will seek the lowest level of charge" it is obvious that even if the river-truck rate might be lower than the rail rate physical facts show that it would be impossible for the refiners to use water carriers only. Lack of facilities and equipment would prevent such an event, and undoubtedly it was for such reason that the Commission said that it was not justified in assuming that the refiners "would use every means in their power to bring down their transportation costs to the lowest possible level".

There remains the question as to whether or not the petitioners at a 25-cent rate would obtain a fair return, and thus bring the public interests into conflict with the policy of equality among carriers. The Commission found that the proposed rates were "compensatory, considering all costs" and "would yield some margin over full costs". It did not find that the proposed rates would yield a "fair return" to the petitioners. The clear implication is to the contrary, for the Commission said: "we shall prescribe minimum rates which in our judgment will promote a somewhat healthier degree of prosperity for all carriers concerned". It is not contended that the evidence disclosed that the proposed rates would yield a fair return to the petitioners. In this situation we must assume the contrary, and therefore a conflicting public interest does not appear.

Decree will be entered for defendant.

McCOLLOCH, District Judge (concurring specially).

I feel that this case can and should be decided on the basis of the power granted by Congress to the Interstate Commerce Commission to regulate trucks and railroads, and on the basis of Congress's declared policy[1]: " * * * to regulate transportation by motor carriers in such manner as to * * * improve the relations between, and coordinate transportation by and regulation of, motor carriers and other carriers; * * *". 49 U.S.C.A. § 302.

Trucks can effectively participate in the movement of the petroleum products in question only by short hauling from Umatilla and Attalia.[2] If the railroads are permitted to lower rates from marine storage

[1] Compare Ann Arbor R. Co. v. United States, 281 U.S. 658, 50 S.Ct. 444, 74 L.Ed. 1098, for the effect of a Congressional declaration of policy.

[2] The time may come when trucks can long-haul from Portland or Puget Sound to Spokane in competition with the railroads. The State of Oregon is contemplating the construction of a fast, straight line, water grade, hard surfaced highway from Portland to The Dalles. This will greatly shorten the time and reduce the expense of trucking from Portland to Spokane and the Inland Empire. Proportionately to population and resources, Oregon is far in advance of

at Portland and on Puget Sound to Spokane and intermediate points, below the combined costs of the river carriers and the trucks, the trucks will get none of the business; and the Commission rightfully held that it was within its granted powers to protect the trucks in a fair share of the business, even though the incidental effect was beneficial to the other transportation agency involved,—the unregulated water carriers.

The Commission found that 19¢ per hundred pounds was a reasonable minimum rate for common carrier truckers to charge from Umatilla to Spokane, and lesser sums to intermediate points. No common carrier trucker has challenged this finding. Having determined the lowest rate at which the truckers could operate with some profit, the Commission then, of necessity, had to make an estimate of what the river costs would be. The Commission thought that the river charges would stabilize at about 9½¢, including incidentals. The total of the reasonable minimum (19¢) prescribed for the truckers, plus the Commission's estimate of the final figures at which the river charges would stabilize, indicated the reasonable minimum rate to be charged by the railroads.

It seems helpful here to refer to one of the fundamentals in this case. The railroads thought a rate as low as 25¢ was necessary "to meet" water and truck competition, based on the estimate of 7½¢ for water carriage and an uncertain sum (but definitely less than 19¢) for truck haul. There was testimony that the oil companies could haul from Umatilla to Spokane for as low as 15¢ per hundred pounds.

In principle, the Commission has given the railroads what they asked. It gave them a rate which, in the Commission's judgment, will "meet" water and truck competition.

The Commission strongly intimated that if its estimate as to the cost of competitive haulage proved too high, whether through lower charges by the present operators, or other operators who may come on the river, or through use by the oil companies of their own tankers and trucks, the Commission would permit the railroads to further reduce their rates to meet the lower competitive charges thus resulting.[3] In short, the Commission has said to the railroads: so long as the return to you is reasonably compensatory, we will allow you to meet competition. For the present, having it in our power to do so, we will fix the common carrier truck rates at a somewhat higher figure than you used in your build-up of the rate of 25¢ which you thought necessary to meet river-truck competition. And for the present, we disagree with you by 2¢ as to what costs on the river will be.[4]

In a situation so nebulous, we may not substitute our judgment for the judgment of the Commission, as to how low a rate the railroads must put in to meet competition, present and future.

No one can, I think, question the Commission's power under the statutory mandate to coordinate transportation by rail and truck, to attempt an equitable apportionment of the traffic involved between the railroads and the trucks,[5] even though this results incidentally in help and protection of a decisive nature to intermediate unregulated water carriers. Because of the interest in the

most of the States in permanent highway mileage, and, as might be expected, as a result, hauling by truck has expanded rapidly in recent years.

3 " * * * If we were to assume that the shippers of petroleum products would use every means in their power to bring down their transportation costs to the lowest possible level, regardless of the effect upon the public carriers whose welfare is vital to the best interests of the country, we would go to a somewhat lower level of minimum rates. * * *". Page 637 of the printed report.

4 The power to prescribe minimum rates, 49 U.S.C.A. § 15 (1), would seem to authorize the Commission to impose its judgment, when reasonably exercised, over the judgment of a carrier or carriers, as to how low a rate is necessary

in a given case "to meet competition". Compare Mississippi Valley Barge Line Co. v. United States et al., D.C., 4 F. Supp. 745, at page 746 towards the bottom of the first column: " * * * Thereby the Commission approved the proposed rates in so far as they were based upon the 60,000 pound minimum, but did not approve the rates based upon the 80,000 pound minimum, *which it found were lower than the necessities of the situation required * * *".* (Italics added).

5 The oil companies intend to see to it that the water carriers always get a material portion of the business. Printed report, p. 619. The Government and other public agencies have spent over $91,000,000 in improving the Columbia River (printed report, p. 615), and the

case before us of the regulated trucks, what was said in Mississippi Valley Barge Line Co. v. United States et al., 292 U.S. 282, 54 S.Ct. 692, 78 L.Ed. 1260,[6] is to be distinguished from the present case. To give the railroads the same rate as the railroads' allied competitors cannot be said to be unreasonable, under all of the facts of the case. The underlying difference between the Commission and the railroads is on the facts, as to what the competitive combined truck-water rate will ultimately be.[7]

Neither of the two steps which the Commission took in thus arriving at what it considered proper stabilization of the traffic between the rails and the river-truck route can be criticized as a matter of law. Fixing the minimum rate for the truckers was but exercise of the granted power to fix minimum reasonable truck rates, 49 U.S. C.A. § 316(e), and the Commission's conclusion as to cost of river carriage certainly falls within the domain of lawfully exercised administrative fact-finding power, even though the Commission's conclusion is seriously at variance with the judgment of the railroads.

In view of the abundance of testimony that private truckers and the oil companies can haul for much less than the truck rate

which the Commission has approved, we well might, were we the original triers of the facts, share the doubt expressed by Commissioner Aitchison, who dissented, as to the wisdom of the Commission's determination that the rate of 19¢ allowed to the common carrier trucks from Umatilla to Spokane will bring the business to the regulated trucks. But that, to repeat, is a matter of administrative judgment, with which we may disagree, but with which we may not interfere.

For the reasons given, the order should be sustained.

**JAMES ALGER FEE**, District Judge (dissenting).

The Interstate Commerce Commission have in this case departed from the traditional role of conservators of the interests of the public at large, by refusing to permit rail carriers to reduce rates on petroleum products from Portland, Oregon, to the area near Spokane, Washington, even though the Commission found such proposed rates were "compensatory considering all costs". Thereby, the Commission not only interfered with the managerial discretion of the rail carriers,[1] but also frustrated a fundamental policy established by

---

oil companies intend to use the river thus improved as a permanent rate leveler.

6 "* * * The admonition does not mean that carriers by rail shall be required to maintain a rate that is too high for fear that through the change they may cut into the profits of carriers by water. * * *" Quoted from 292 U.S. at page 288, 54 S.Ct. at page 694, 78 L. Ed. 1260.

7 To me this case is the same in principle as if the trucks were long-hauling from Portland or Puget Sound in competition with the railroads. Given the power to coordinate transportation by truck and railroad, and to regulate both, the Commission could, I think, fix an equal rate for truck and railroad for the long haul, so long as the inherent advantages of one or the other form of transportation were not disregarded. I believe the Commission can do the same thing here, even though the participation by the trucks in the competitive haulage is only by short hauling, and even though the incidental result of the order is highly beneficial to the intermediate unregulated water carriers.

In this connection, I frankly concede that if words mean anything, the Com-

mission had the interests of the unregulated water carriers in mind equally with the regulated motor carriers. But I do not feel that the order is vitiated by the concern which the Commission manifested for the welfare of the unregulated water carriers.

Congress has said: "It is declared to be the policy of Congress to promote, encourage, and develop water transportation, service, and facilities in connection with the commerce of the United States, and to foster and preserve in full vigor both rail and water transportation. * * *" 49 U.S.C.A. § 142.

Compare Commissioner Aitchison's well reasoned dissenting opinion: "* * * Our function * * * is to see that there is fair competition between the common carriers whom we regulate, and that the rights of the river carriers— left unregulated by the deliberate determination of Congress—are respected." (Bottom of p. 651 of the printed report).

The Commissioner dissented as to the minimum rate prescribed for the truckers. He thought that the truckers should be allowed to go as low as 17¢, making a combined river-truck rate of 26½¢.

1 United States v. Chicago, Milwaukee, St. Paul & Pacific RR Co., 294 U.S.

the Congress that the lowest rates should prevail where consistent with the proper service.

It has been heretofore considered axiomatic that "The Act was passed for the protection of those who pay or bear the rates".[2] The history of the legislation proves that regulation was first imposed to control high rates,[3] and not until thirty years later were the Commission given authority to fix minima to prevent the carriers from destroying adequate railway service by eliminating rail competition[3] and thereafter raising the rate.[4]

Consistently with this historical background there was written into the statutes, in 1933, a specific direction to the Commission, in the exercise of the power to prescribe just and reasonable rates, to give due consideration among other factors, "to the need, *in the public interest*,[5] of adequate and efficient railway transportation service. *at the lowest cost*[5] consistent with the furnishing of such service."[6]

Furthermore, the Motor Transport Act of 1935 contains no language which amends the rate making clauses of the Transportation Act, although the policy announced in part is to "improve the relations between, and coordinate transportation by and regulation of, motor carriers and other carriers".[7] The historical policy as to *rail rates* was thereby unchanged.

The Congress, acting under a delegation of power under the Constitution, are supreme over an administrative body created by law. The Interstate Commerce Commission fall under this supreme power.[8] In dealing with statutes passed by the Congress relating to the Commission, not only the power granted, but the limitations imposed, should be considered.[9] The courts should construe these laws in the light of their history and should not be confined to a narrow and dry textual construction, but should neither broaden nor narrow the grants, to subserve ends which they might believe proper policy.

The legislative policy heretofore outlined must be followed by the Commission.

In order that the Commission might not overflow the canalization of legislation granting power to act, the Supreme Court of the United States has required the making of specific jurisdictional findings.[10] This is no formal ceremony, but of substance.[11] Once findings are so made, every possible intendment must be used to sustain the conclusions. The courts should use every effort not to thwart the legislative will. But where the Congress have not granted the power of which exercise is attempted, the courts should not be astute to shore up the foundations of jurisdiction. Otherwise, the administrative body would be controlled neither by the courts nor by its creator.

In order to determine, then, whether the fundamental policy of the Congress above outlined was upheld, the findings made by the Commission must be considered. A minority of that body wrote the opinion.

499, 506, 55 S.Ct. 462, 79 L.Ed. 1023; Texas & Pacific Ry. v. United States, 289 U.S. 627, 636, 53 S.Ct. 768, 77 L.Ed. 1410.

[2] Texas & Pacific Ry. v. United States, supra, 289 U.S. at page 638, 53 S.Ct. at page 772, 77 L.Ed. 1410.

[3] Skinner & Eddy Corp. v. United States, 249 U.S. 557, 564, 39 S.Ct. 375, 63 L.Ed. 772.

[4] If these rates are lowered to meet water competition they cannot thereafter be raised, unless "upon changed conditions other than the elimination of water competition". 49 U.S.C.A. § 4, par. (2).

[5] Emphasis supplied.

[6] 49 U.S.C.A. § 15a(2).

[7] 49 U.S.C.A. § 302(a).

[8] The Commission acts "as an agency of Congress, to apply the law of the land to facts developed of record in matters committed by Congress to our jurisdiction". St. Louis & O'Fallon Ry. Co. v. United States, 279 U.S. 461, 487, 49 S. Ct. 384, 388, 73 L.Ed. 798.

[9] The courts have prevented an exercise of power where the Commission has attempted to act extralaterally. See Interstate Commerce Commission v. Diffenbaugh, 222 U.S. 42, 46, 47, 32 S.Ct. 22, 56 L.Ed. 83; Anchor Coal Co. v. United States, D.C., 25 F.2d 462, 472; St. Louis & O'Fallon Ry. Co. v. United States, supra; Southern Pacific Co. v. Interstate Commerce Commission, 219 U. S. 433, 449, 450, 31 S.Ct. 288, 55 L.Ed. 283.

[10] "In the absence of a finding of essential basic facts, the order cannot be sustained. Florida v. United States, 282 U.S. 194, 215, 51 S.Ct. 119, 75 L.Ed. 291." Atchison Ry. v. United States, 295 U.S. 193, 202, 55 S.Ct. 748, 752, 79 L.Ed. 1382.

[11] United States v. Baltimore & Ohio RR Co., 293 U.S. 454, 464, 55 S.Ct. 268, 79 L.Ed. 587.

There are two concurring opinions, three dissenting opinions and one concurrence in dissent, while one Commissioner did not sit. The result is confusing, on account of the fact that essentials are obscured by an extended discussion contained in the opinion of the minority. An analysis of the entire document crystallizes certain negative positions. It is clear that the Commission did not find the rates proposed were unjustly discriminatory, unduly preferential or prejudicial or in violation of the "long and short haul" clause. Nor were there findings that these rates interfered with the movement of traffic, prevented adequate or efficient service or resulted in failure of any rail carrier to earn a fair return upon its property as a whole. The Commission did not find that the rates were unjust or unreasonable, except as this may be implied in the finding that the rates were too low, which will be hereafter discussed.

Notwithstanding the fact thus shown that the rates proposed did not violate any of the standards set up by the governing statutes, the Commission failed to uphold them. It appears, then, that the minority of the Commission who joined in the opinion did not make jurisdictional findings, because none could have been made which gave legal support for the disapproval of the rate. The basis of the failure to confirm these schedules which permitted "adequate and efficient service" "at lowest cost" "in the public interest" can only be discovered in certain "phrases or sentences".[12] The conclusion is arrived at that these proposed rates "are below a minimum reason-

able level and hence unlawful". If this phrase is anything but the begging of the question, it is directly contrary to the finding of fact contained in the opinion that the rates proposed are "compensatory considering all costs". Likewise, the policy of the lowest cost consistent with service is violated. This statement that the rates are below a reasonable minimum is not a conclusion which must be approved "when there is found to be a rational basis"[13] therefor, because "the statement * * * that the proposed rates would be 'unreasonable' must be read in the light of the report as a whole, and then appears as a conclusion insufficient as a finding unless supported by facts more particularly stated".[14]

The real basis of the opinion of the minority of the Interstate Commerce Commission is an assumption of power[15] over all forms of transportation and the responsibility for maintaining the financial stability of each, whether regulated or unregulated. The costs as to each are found and enter into the general picture.[16]

The assumptions are thus broadly stated by the Commission in the opinion. "We were given power to fix minimum rates, however, primarily for the purpose of preventing destructive competition in rates and promoting the financial stability *of the transportation agencies*".[5] says the opinion. This is followed by the statement: "We shall prescribe minimum rates which in our judgment will promote a somewhat healthier degree of prosperity *for all carriers*

---

[12] United States v. Chicago, Milwaukee, St. Paul & Pacific R. R. Co., supra.

[13] Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286, 287, 54 S.Ct. 692, 694, 78 L.Ed. 1260.

[14] United States v. Chicago, Milwaukee, St. Paul & Pacific RR Co., supra [294 U.S. 499, 55 S.Ct. 465, 79 L.Ed. 1023]; Florida v. United States, 292 U.S. 1, 54 S.Ct. 603, 78 L.Ed. 1077; Southern Pacific v. Interstate Commerce Commission, supra.

[15] " * * * although the order made by the Commission may have been couched in a form which would cause it, superficially considered, to appear to be but the exercise of an authority to correct an unreasonable rate, yet if it plainly results from the record that the order of the Commission was not the exercise of such an authority, but was based

upon the assumption by that body of the possession of a power not conferred by law, the mere form given by the Commission to its action does not relieve the courts from the duty of reviewing and correcting an abuse of power." Southern Pacific Company v. Interstate Commerce Commission, supra, 219 U.S. at page 443, 31 S.Ct. at page 290, 55 L.Ed. 283.

[16] An order of the Commission may be set aside "because facts and circumstances were considered which could not legally influence the conclusion, Interstate Commerce Commission v. Diffenbaugh [supra]; Florida East Coast Lines v. United States, 234 U.S. 167, 187, 34 S. Ct. 867, 58 L.Ed. 1267." St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 75, 56 S.Ct. 720, 736, 80 L.Ed. 1033.

[5] Emphasis supplied.

concerned, by rail, by highway and by water."[5]

The argument to sustain this assumption of power is made, not by the Commission itself, but in the briefs submitted, on the ground, first, that the Commission have power to equalize rates between the railroads and the motor carriers by requiring the former to charge a rate high enough to enable the latter to make a profit; second, that the Commission had power to require the rail carriers to charge rates high enough to permit the water transport to pay operative costs.

As to the primary position, competition for the railroads arose here with carriers, by motor truck, some privately owned and transporting the owners' goods alone, others in unregulated intrastate commerce alone, others operating solely under contract and finally, regulated common carriers in intrastate and interstate commerce, respectively. It is obvious some of such carriers are entirely unregulated, others are controlled by the State of Washington alone, and some are restrained by the federal Commission. A *through rail* rate from Portland to Spokane is the subject of controversy here, while the motor carriers of whatever class are competitive over a portion of the distance only, i.e., from Attalia or Umatilla to Spokane. There are no joint rates involved. When the Commission prevented the railroads from charging the lowest rate compatible with adequate service because of a self-imposed guardianship over this nondescript motor transport, the duty imposed by the Transportation Act of 1920 upon that body as to the railroads and the public has been disregarded.

The Motor Transport Act was enacted "to put certain motor transport in interstate commerce under regulation". It was not an amendment of the Transportation Act of 1920 as amended in 1933. The declaration of policy of this law did not and was not apt to change the specific declarations of 15a of the Act relating to rail transportation.[17] In any event, even if the *ex riven* rates of truck and railroad could have been equalized,[18] no authority can be found to raise a through rail rate solely competitive with water rates over a great portion of the route, for the purpose of benefiting motor carriers competitive only over another portion of the whole route.

This brings up the next point, that the Commission can protect water carriers from rail competition. The inland water transport is entirely unregulated at present. The Commission have no power to require cost accounting by the operators. The traffic here is in part between Portland, Oregon, to Umatilla, Oregon, although the Columbia is a boundary river. Apparently, these lines are contract and not common carriers. Again, these are competitive with rail over only a portion of the distance over which the rail through rates apply.

It has been judicially declared that the power of the Commission to raise rail rates to protect a water carrier, under the declaration of policy contained in the Transportation Act of 1920 applies only (1) where joint rail and water rates have been established, (2) where the railroad through disinterested malevolence attempts to destroy a water carrier. In other instances, the railroad may exercise managerial discretion to lower rates, even if the water carrier be driven off the river, if no other clauses of the Act have been violated.[19]

The first exception is not involved here, since there are no joint rates with any other common carrier involved. No boat or barge line has complied with the provisions of the statute by which joint rates might be established. See Title 49 U.S.C.A. § 153 (e).

As to the second exception, if the Commission had found as a fact that the rail carriers were deliberately attempting to throttle water traffic upon the Columbia, the order would be valid, in part. It is the de-

---

[5] Emphasis supplied.

[17] See Ann Arbor R. Co. v. United States, 281 U.S. 658, 50 S.Ct. 444, 74 L.Ed. 1098.

[18] In this connection, the Commission have recognized the fact that in considering rail and truck competition, the lowest cost should prevail to take advantage of the inherent facilities of each form. It is said: "The public interest, the advancement of which is the main purpose of the law, does not require that one type of transportation agency be protected from the competition of another when such competition results from the ability of the latter to render adequate and efficient service at lower cost to itself and resulting lower charges to the public." Petroleum from California to Oregon, 214 I.C.C. 668, 677. See Petroleum Between Washington and Oregon Points, 225 I.C.C. 382.

[19] Mississippi Valley Barge Line Co. v. United States, supra.

clared policy of the Congress "to promote, encourage, and develop water transportation, service, and facilities in connection with the commerce of the United States, and to foster and preserve in full vigor both rail and water transportation."[20] The Committee of the House in 1920 indicated that this clause "would also prevent a rail carrier from destroying water competition between competitive points by prohibiting such carrier from so reducing its rates as to destroy its water competitor".[21] If " 'disinterested malevolence' (American Bank & Trust Co. v. Federal Reserve Bank, 256 U.S. 350, 358, 41 S.Ct. 499, 65 L.Ed. 983 [25 A.L.R. 971]), or something akin thereto, has supplied the motive power. M. Steinert & Sons Co. v. Tagen, 207 Mass. 394, 397, 93 N.E. 584, 32 L.R.A.(N.S.) 1013; Nann v. Raimist, 255 N.Y. 307, 319, 174 N. E. 690, 73 A.L.R. 669.", then the Commission would disapprove the rate and protect the water carrier.[22] The lack of such finding appears glaring and none should be supplied.[23] No "rational basis" for such a "conclusion" appears. In fact, the contrary is probably true. The rail carriers established the rate to recapture the traffic in petroleum products which has been slipping away from them because of the recent opening of the locks at Bonneville. No water carrier has intervened here on the ground that it was to be destroyed. In fact, there are indications that the oil companies are going to maintain this river traffic at all events. The great pressure to sustain the order comes from the motor carriers who are not competitive over this area.

The opinion in Mississippi Valley Barge Line Co. v. United States, supra, is binding upon this court. The implications of the decision are that a railroad may meet water competition as it chooses, if no other

clauses of the Transportation Act are violated. In this connection, a pertinent factor in sustaining the managerial discretion of the railroads is the direct amendment of the specific clause relating to railroads after the act had been in operation for years. Any implications contained in the former declaration of policy were thereby overthrown.

If the sentences above quoted relating to the power to fix minimum rates are placed upon the broad basis of the right to consider all carriers, by rail, by highway and by water, of whatever class or variety, the Commission are usurping a power, so far denied by Congress,[24] judicially declared not to exist [25] and long abandoned by that body itself.[26]

If the Commission had simply declared the right to control all forms of transportation but had not gone further and based thereon the authority to prevent rail carriers from making available adequate and efficient service at the lowest cost "in the public interest", no harm might have resulted.

But the Commission further say: "Our duty in the exercise of that power is not done, therefore, if we allow competitive rates to gravitate to the lowest possible level."

The mandate of the Congress, which is supreme over the Commission, directs that rail rates shall be so allowed to gravitate, if proper service is maintained.

This "duty", then, is in direct violation of the historical policy above outlined. It disregards the fact that if all transportation agencies are put under regulation as contemplated by pending legislation, provisions permitting reduction of rates in the public interest to a point where these are barely

---

[20] Section 500 Transportation Act 1920, 49 U.S.C.A. § 142.

[21] House Report No. 456, 66th Congress, 1st Session 1919, page 19.

[22] Mississippi Valley Barge Line Co. v. United States, supra.

[23] "Recently this court has repelled the suggestion that lack of express finding by an administrative agency may be supplied by implication. Panama Refining Co. v. Ryan, 293 U.S. 388, 433, 55 S.Ct. 241, 79 L.Ed. 446." Atchison Ry. v. United States, supra.

[24] If the specific rate clause set out in Title 49 U.S.C.A. § 15a(2), passed June 16, 1933, is inconsistent with the declaration of policy in the Transportation Act

of 1920, the prior law is overruled as to rates of rail carriers. The question of rail rates is determined by the provisions of the Interstate Commerce Act, and the rate clause overrules a declaration of policy. Ann Arbor R. Co. v. United States, supra, 281 U.S. at pages 668, 669, 50 S. Ct. at page 444, 74 L.Ed. 1098.

[25] Mississippi Valley Barge Line Co. v. United States, supra.

[26] Petroleum from California to Oregon, 214 I.C.C. 668; Petroleum Between Washington and Oregon Points, 225 I. C.C. 382; Receipt and Delivery Service At Eastern Points, 225 I.C.C. 789; Malt Liquors from New Orleans to Texas Points, 227 I.C.C. 439.

compensatory will probably be included in accordance with historical policy.

These expressions adopt the theory that all forms of transportation, rail, highway and water, must be on an equality as to rates,[27] and that none may lower its rate on a particular commodity, so that another form of transport, regulated or unregulated, might be crowded out of the particular field. The Congress, on the other hand, have adopted as to rail carriers the lowest cost to the public consistent with service as a criterion. The conflict between the two ideas is irreconcilable and the policy of the Congress must be sustained.[28]

The hearing and debates of the Congress on the pending legislation prove that it has been assumed that the theory that the Commission should produce equality of opportunity by rate fixing has never been conceded.[29] On the other hand, a bitter conflict has been waged over the attempt to place regulation of water carriers under the Interstate Commerce Commission, instead of leaving them at present in large part unregulated and in part regulated by the Maritime Commission,[30] and over the attempt to place motor transport and rail carriers on equality of regulation.

The fundamental flaw in the Commission's position is the attempt "to create that equality of opportunity which should fairly apportion the traffic between the rail lines and the river-truck routes". In this instance, the supposedly desirable result was accomplished by establishing an equality of rate between the rail carriers and the motor transport carriers in interstate commerce. Adherence to the principle that one type of regulated carrier must keep rates on a particular commodity between certain areas up to a point where regulated transport of another type may make a profit over only part of the distance, denies equality of opportunity and fails to take advantage of the inherent advantages of each form of transportation. Competition between different forms might eliminate the form of carrier which did not possess those qualifications. The public bears the cost, which the Congress have so far declared must be as low as possible consistent with adequate transportation service. It is clear that in proving equality of rates among regulated carriers here the unregulated carriers are also permitted to operate if they choose at a high profit or to undercut the rates to such an extent that they can absorb the traffic to capacity.

The apportionment of the traffic requires the Commission to disregard the inherent advantages of each form of transportation. Furthermore, apportionment apparently requires adherence to the theory that the rail carrier cannot lower its rates below the point where the unregulated carriers can operate at a profit. In these days when rail carrier finance is of moment and certain railroads are in a precarious condition, this doctrine will have a corollary. The Commission can scarcely refuse to require trucks and water carriers to keep up rates on wheat downstream[31] at a level on which the railroad can make a compensatory return on that traffic, if that body have control of, and have the responsibility of apportioning the traffic fairly between, all forms of transportation. The violation of the principles of lowest cost consistent with proper service would in that instance be crystal clear not only to the Commission but to the public in whose interest the principle was established.

The Commission made one finding which laid the basis for a proper conclusion sustaining the proposed rates. It is positively

---

[27] The theory of equality of rate is directly contrary to the declaration of policy of the Motor Transport Act, Sec. 202, 49 U.S.C.A. § 302(a), which requires recognition and preservation of the "inherent advantages" of each form of transportation.

"One of the 'inherent advantages' of such transportation which we must thus 'recognize and preserve' is its economy under certain conditions, as compared with other forms of transportation, and another is its ability under certain conditions to provide better service". Petroleum Between Washington and Oregon Points, 225 I.C.C. 382, concurring opinion of Commissioner Eastman.

[28] See Note 9.

[29] See Hearings before the Committee on Interstate Commerce, Seventy-Sixth Congress, April 3 to 14, 1939, 6, 7, 368–370.

[30] See Hearings before the Committee on Interstate Commerce, Seventy-Sixth Congress, 613–654, 660–711.

[31] This return traffic of wheat downstream appears in the record. Strangely enough, it seems not to have been mentioned by anyone involved in comparison with the rail rates on the same commodity.

found that these through rates "are compensatory considering all costs."[32] Since the rates are lower than any others offered it must be assumed this is the "lowest cost" attainable "in the public interest". Specifically, this finding guarantees the possibility of the maintenance of "adequate and efficient railway service" while the schedule was in effect. This finding, in the absence of any intimation that the proposed rates violated any other provision of the governing statute, laid an unshatterable foundation for approval thereof.

The Congress, not the Commission nor the courts, should initiate radical departures from a policy long declared to be in the public interest.

The order should be set aside or modified.

[32] "There is no suggestion in the report that the rates have been so reduced as to be less than compensatory". United States v. Chicago, Milwaukee, St. Paul & Pacific R. R. Co., supra.